(No. 51657.—▮▮▮▮▮▮▮▮▮▮)

*In re* PAUL T. WIGODA, Attorney, Respondent.

*Opinion filed October 2, 1979.*

WARD, J., took no part.

John C. O'Malley and Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for respondent.

MR. JUSTICE CLARK delivered the opinion of the court:

Pursuant to Rule 753(e) (65 Ill. 2d R. 753), the Administrator of the Attorney Registration and Disciplinary Commission has been granted leave by us to file exceptions to the report and recommendation (with a dissent) of the Review Board, which affirmed the Hearing Board's recommendation that the respondent, Paul T. Wigoda, a former alderman in the city council of Chicago,

be reinstated to the Illinois bar. Also pursuant to Rule 753(e), we allowed the Administrator and respondent to file briefs and orally argue. There is no dispute of facts. A chronology of occurrences is necessary, however.

On October 10, 1974, respondent, admitted to the bar in 1950, was convicted by a jury in Federal district court for filing a false income tax return for the year 1969; he failed to report a $50,000 bribe. He was suspended from the practice of law on March 20, 1975, and disbarred on consent and his name stricken from the roll of attorneys (58 Ill. 2d R. 762) on January 26, 1976. Respondent entered a Federal prison January 9, 1976, and was released on July 2, 1976. On July 21, 1977, he petitioned for reinstatement (65 Ill. 2d R. 767).

The first issue raised, not directly addressed by this court before, is whether respondent's petition is premature. The Administrator contends the period of time in between respondent's disbarment on consent and his petition—19 months—is insufficient to establish a "clear showing" of rehabilitation. The Administrator urges us to seek guidance from our Rule 767 (73 Ill. 2d R. 767), as amended subsequent to respondent's petition: "No petition shall be filed within a period of *** 3 years after the date of an order allowing disbarment on consent ***." The Administrator readily acknowledges this provision of our rules was not effective until almost a year after respondent filed his petition for reinstatement. At the time of filing respondent's petition, Rule 767 (65 Ill. 2d R. 767) provided: "When an attorney who has been *** disbarred on consent wishes to be reinstated ***, he shall file his verified petition with the clerk of the court." We disagree with the Administrator's position for several reasons.

First, under Rule 767, as effective on July 21, 1977, respondent filed his petition properly and in good faith. (See *In re Estate of Krotzsch* (1975), 60 Ill. 2d 342, 345.)

Second, the period of time between a disbarment on consent and a petition for reinstatement is not dispositive of the determination of rehabilitation. Rather, the evidence is. (We do not imply that the present requirement of three years is arbitrary. That reflects our concern for the gravity of disbarment and the improper act or acts which lead to disbarment. Accordingly, we do not make light of respondent's criminal conviction.) Third, over four years have passed since respondent's suspension and over 3½ years since his disbarment on consent. It would be meaningless, if not inane, to deny respondent reinstatement on the basis of the sole issue of prematurity, then impliedly and seriously suggest that, since three years have passed, respondent may again begin the process of petitioning for reinstatement.

The second issue raised then is whether respondent has demonstrated that he is rehabilitated, and fit to practice law. The standard to be utilized is that a respondent must establish rehabilitation sufficient for reinstatement, by clear and convincing evidence. (See *In re Starr* (1976), 64 Ill. 2d 407, 415.) The Administrator contends that burden has not been met despite the recommendations of the Hearing Board and Review Board that respondent be reinstated. The findings of those boards are, of course, advisory and not binding. (*In re Ashbach* (1958), 13 Ill. 2d 411, 418.) We have repeatedly said, however, that the findings of those boards are "entitled to virtually the same weight as the findings of any initial trier of fact." (*In re Hallett* (1974), 58 Ill. 2d 239, 250. Accord, *e.g., In re Reynolds* (1965), 32 Ill. 2d 331, 336; *In re Bossov* (1975), 60 Ill. 2d 439, 441; *In re Smith* (1976), 63 Ill. 2d 250, 255; *In re Teichner* (1979), 75 Ill. 2d 88, 97; and *In re Mitan* (1979), 75 Ill. 2d 118, 124.) The Hearing Board (and Review Board) have the opportunity to observe the demeanor of witnesses, judge their credibility and evaluate their testimony. (*E.g., In re Bossov* (1975),

60 Ill. 2d 439, 441.) Where the findings and recommendations of those boards are "based on uncontradicted and clear evidence," they will be adopted. (*In re Phelps* (1973), 55 Ill. 2d 319, 322.) We find the evidence here to be clear, convincing and uncontradicted; therefore we do not agree with the contentions of the Administrator.

The Administrator has contended several things. First, respondent's activities after disbarment, in prison and out, fail to demonstrate rehabilitation. Second, the testimony and affidavits of numerous people, favorable to respondent, lack probative value due to their bias, their failure to distinguish between the periods before and after respondent's conviction, and their lack of extensive or intensive contact with respondent after his release from prison. Third, respondent's continuous assertion of innocence indicates a lack of repentance and is a factor which should be considered in evaluating the evidence. Fourth, respondent is only very reluctantly paying his Federal tax liability (based on the conviction) after initially "refus[ing] to make an arrangement to pay this tax."

We will address each of the Administrator's arguments in reverse order. Given respondent's assertion of innocence, it is not surprising that he has contested his Federal tax liability. However, it is clear he is now ready and willing to pay, which even the Administrator does not deny.

Respondent's assertion of innocence, and therefore, consistent with that, his lack of repentance, are factors to be considered in considering a petition for reinstatement. However, repentance and rehabilitation are not the same. Rehabilitation, the most important consideration in reinstatement proceedings, is a matter of one's "return" to a beneficial, constructive and trustworthy role. Repentance is a matter of contrition and regret. (See, *e.g., In re Thomas* (1979), 76 Ill. 2d 185, 190 (Thomas was not convicted of the crimes charged).) We find the comments

of the Supreme Judicial Court of Massachusetts in *In re Hiss* (1975), 368 Mass. 447, 457-59, 333 N.E.2d 429, 436-37, especially appropriate:

"The continued assertion of innocence in the face of prior conviction does not, as might be argued, constitute *conclusive* proof of lack of the necessary moral character to merit reinstatement. Though we deem prior judgments dispositive of all factual issues and deny attorneys subject to disciplinary proceedings the right to relitigate issues of guilt, we recognize that a convicted person may on sincere reasoning believe himself to be innocent. We also take cognizance of Hiss's argument that miscarriages of justice are possible. Basically, his underlying theory is that innocent men conceivably could be convicted, that a contrary view would place a mantle of absolute and inviolate perfection on our system of justice, and that this is an attribute that cannot be claimed for any human institution or activity. We do not believe we can say with certainty in this case, or perhaps any case, what is the true state of mind of the petitioner. Thus, we cannot say that every person who, under oath, protests his innocence after conviction and refuses to repent is committing perjury.

Simple fairness and fundamental justice demand that the person who believes he is innocent though convicted should not be required to confess guilt to a criminal *act* he honestly believes he did not commit. For him, a rule requiring admission of guilt and repentance creates a cruel quandary: he may stand mute and lose his opportunity; or he may cast aside his hard-retained scruples and, paradoxically, commit what he regards as perjury to prove his worthiness

to practice law. Men who are honest would prefer to relinquish the opportunity conditioned by this rule \*\*\*. Honest men would suffer permanent disbarment under such a rule. Others, less sure of their moral positions, would be tempted to commit perjury by admitting to a nonexistent offense (or to an offense they believe is non-existent) to secure reinstatement. So regarded, this rule, intended to maintain the integrity of the bar, would encourage corruption in these latter petitioners for reinstatement and, again para-doxically, might permit reinstatement of those least fit to serve. We do not consider in this context the person who admits committing the alleged criminal act but honestly believes it is not unlawful.

Accordingly, we refuse to disqualify a peti-tioner for reinstatement *solely* because he con-tinues to protest his innocence of the crime of which he was convicted. Repentance or lack of repentance is evidence, like any other, to be considered in the evaluation of a petitioner's character and of the likely repercussions of his requested reinstatement. However, nothing we have said here should be construed as detracting one iota from the fact that in considering Hiss's petition we consider him to be guilty as charged. Our discussion relates only to the issue whether Hiss must admit his guilt as condition to reinstatement." (Emphasis in original.)

We believe respondent's continuing belief in his innocence insufficient to bar reinstatement; we must look further.

The evidence shows the following. Respondent, while in prison, was engaged in religious activities and activities for education of prisoners and on behalf of the blind and was commended by prison authorities. Upon his release, he

returned to Chicago to live with his family, began writing a textbook on municipal government and another work, helped his ailing father manage a hotel, and avoided politics and the practice of law. The Administrator has pointed out, apparently with a negative implication, that respondent has resigned from many civic and charitable organizations in which he actively worked prior to his conviction and imprisonment. We believe respondent could also have been motivated by the desire to save them from the embarrassment of association with a convicted member. We note that respondent has maintained his ties with the Rogers Park and Edgewater Community Councils.

Character testimony by a rabbi, a nun and educator, two attorneys, two members of the judiciary, a university professor, bank president, and "organizational consultant" on behalf of respondent was favorable. Although, as the Hearing Board expressly said, the testimony was based on the witnesses' relationships with respondent prior to his conviction, all testified their views were no different despite the conviction: he was honest and, to the extent they were qualified to say, competent. Several witnesses had "substantial recent contacts" with respondent. Moreover, 126 affidavits from members of the circuit and appellate courts, legislators, a congressman, attorneys, clergymen and others, have been filed and attest to their knowledge of respondent's conviction, the length of their acquaintance with respondent before and after the conviction, and their belief in his rehabilitation and fitness to practice law. Finally, respondent testified before the Hearing Board that he had not lost his appreciation for the legal system despite his conviction and protestations of innocence; that he believed a lawyer's acceptance of a bribe is both immoral and illegal; and that he has been attempting to keep informed of changes in the law by reading advance sheets and legal periodicals.

The Administrator's contention that the character

testimony and affidavits lack probative value is not persuasive. It may be that 126 affiants and nine witnesses do not know respondent well enough to accurately assess his rehabilitation and fitness to practice law, but surely not all of them are suspect. These individuals are morally and legally bound by their oaths not to recommend respondent if they are not satisfied he is rehabilitated. (See *Preston v. State Bar* (1946), 28 Cal. 2d 643, 650-51, 171 P.2d 435, 439.) If we attach value to the swearing of an oath, we must attach some probative value to the testimony and affidavits.

We come then to the vital question of assessing the evidence. Just as a "degree of uniformity" (*In re Spencer* (1977), 68 Ill. 2d 496, 501) or "degree of consistency in the selection of sanctions" (*In re Saladino* (1978), 71 Ill. 2d 263, 275) is required in disciplinary proceedings, so too is consistency required in reinstatement proceedings. We do not have benefit of much authority, however. (*E.g., In re Starr* (1976), 64 Ill. 2d 407; *People ex rel. Chicago Bar Association v. Reed* (1930), 341 Ill. 573.) A comparison of the instant case to *Starr* is instructive. There the respondent was disbarred on consent for conversion to his use funds ($11,500) of four clients. Five years later, in 1969, the respondent filed a petition for reinstatement which was denied. In 1974, he again filed a petition for reinstatement. The Hearing Board recommended reinstatement, the Administrator filed exceptions, and the Review Board recommended denying the petition. This court again denied the petition because it found the respondent, despite favorable testimony, had failed to demonstrate rehabilitation for the following reasons. Stipulated facts showed a conviction in 1967 of impersonating a State official and 12 pending civil cases against the respondent. In 1971, the respondent solicited a client for another attorney in violation of the Code of Professional Responsibility. The respondent also failed to com-

ply with this court's Rule 767 by failing to comply with the Attorney Registration and Disciplinary Commission's rules to disclose the civil cases (above) and accurately disclose his financial obligations. In *Starr,* the respondent, after his disbarment, was consistently involved in acts showing no concern for integrity and trustworthiness, hallmarks of the legal profession. That is clearly not the situation here where respondent, since his disbarment and release from prison, has, based on the record before us, lived a blameless life.

Because our concern in attorney disciplinary proceedings is primarily the protection of the public and the integrity of the profession, we cannot lightly pass over his conviction, which "is conclusive evidence of his guilt and is ground for disbarment" (see *In re Pontarelli* (1946), 393 Ill. 310, 314). However, our consideration of the evidence—of his activities since his disbarment—and the testimony and affidavits lead us to the conclusion respondent should be reinstated: he has expressed respect for and knowledge of our system of justice, he is profoundly aware of the gravity of the act of which he was convicted, and he has clearly and convincingly demonstrated his rehabilitation.

For these reasons, respondent's petition for reinstatement should be allowed.

*Respondent reinstated.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.